UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PAUL WILLIAMS and MAKSWILL GRP. CORP.

Plaintiffs,

v.

YING ZHOU, GUOLIANG TIAN, and JIHAHAO[1] INT'L GRP., LTD.

Defendants.

Civ. No. 14-5544 (KM) (MAH)

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiffs, Paul Williams and Makswill Group Corporation ("Makswill"), have brought this action against the defendants, Ying Zhou, Guoliang Tian, and Jiahao International Group, Ltd. ("Jiahao"). Now before the Court is the plaintiffs' motion for summary judgment (DE 133) on Counts Two and Three of the Amended Complaint (DE 81). For the reasons set forth below, I will deny Plaintiffs' motion.

## I. Background[2]

### a. Procedural history

I review the parade of misadventures that constitutes the procedural history of the motion (DE 133) now before me.

---

[1] The parties render this name as "Jiahao." The clerk is directed to correct the caption.

[2] For ease of reference, certain key items from the record will be abbreviated as follows:

| | | | |
|---|---|---|---|
| "PSOF" | = | Plaintiffs' Statement of Undisputed Material Facts | [DE 133-1] |
| "DR" | = | Defendants' Response to PSOF | [DE 153-1] |
| "PRDR" | = | Plaintiffs' Reply to DR | [DE 161 pp. 3-9] |

1

On September 3, 2014, the plaintiffs, who were then *pro se*, filed their first complaint. (DE 1). After a couple of failed attempts, Ms. Zhou filed an answer to the complaint on October 26, 2014. (DE 5; *see* DE 3, 4). On October 21, 2014, *pro se* plaintiff Mr. Williams requested entry of default against defendants Mr. Tian and Jiahao for failure to plead or otherwise defend. On the same date, Mr. Williams filed a motion for default judgment against both defendants. The clerk of the court entered default on October 29, 2014. (*See* DE 6, 7, 9).

On October 21, 2014, some seven days after the complaint had been answered (DE 3; *see also* DE 5), the plaintiffs, still *pro se*, filed a motion for summary judgment (DE 10). The Court administratively terminated that motion without prejudice on March 14, 2016, because it was premature and in any event defective in that it included no statement of undisputed facts. (DE 72; *see* Loc. Civ. R. 56.1.).

On November 3, 2014, Ms. Zhou filed a motion to dismiss for lack of jurisdiction, improper venue, and failure to state a claim. (DE 12, 13). On November 14, 2014, Magistrate Judge Hammer terminated that motion without prejudice because Fed. R. Civ. P. 12(b) requires that a motion to dismiss be filed prior to filing a responsive pleading. (DE 19).

On December 11, 2014, Matthew Weisberg filed a notice of appearance as plaintiffs' counsel. (DE 20).

On January 19, 2015, Mr. Tian and Jiahao filed a motion to vacate plaintiffs' motion for default judgment. (DE 24).

On January 20, 2015, all defendants filed a motion for judgment on the pleadings. (DE 25). This Court administratively terminated defendants' motion, without prejudice, on March 14, 2016, for reasons related to the filing of an amended complaint, as discussed *infra*. (DE 72).

On January 26, 2015, Mr. Weisberg withdrew as plaintiffs' counsel (rendering plaintiffs, again, *pro se*). (DE 28).

On August 19, 2015, Magistrate Judge Hammer denied plaintiffs' motion for default judgment against Mr. Tian and Jiahao as moot. (DE 39).

On August 25, 2015, Mr. Tian and Jiahao filed an answer to the complaint. (DE 40).

Between October and December 2015, the parties engaged in a series of skirmishes regarding discovery, particularly interrogatories and depositions. (*See e.g.*, DE 47–48, 52, 58–59, 62–64, 66).

During that time, on November 10, 2015, Nicholas M. Fausto filed a notice of appearance as substitute counsel for plaintiffs. (DE 61)

After several months of failed attempts, (DE 71, 76), on April 22, 2016, plaintiffs filed a motion for leave to file an amended complaint. (DE 77). On May 10, 2016, Magistrate Judge Hammer granted plaintiffs' motion (DE 80). On May 12, 2016, plaintiffs filed their Amended Complaint. (DE 81).

After a first failed attempt (DE 84), on July 29, 2016, defendants filed a motion to dismiss the Amended Complaint for lack of jurisdiction. (DE 87). On January 6, 2017, I denied defendants' motion. I ruled that the Court did possess subject matter jurisdiction, but that additional discovery would be required on the issue of personal jurisdiction. (DE 98).

On June 8, 2017, defendants filed another motion to dismiss—this time for failure to prosecute the action. (DE 101). On June 9, 2017, Magistrate Judge Hammer administratively terminated defendants' motion because it was premature and because defendants failed to file a brief with their motion. (DE 102).

After the close of discovery on the personal jurisdiction issue (DE 104), on August 13, 2017, defendants filed a renewed motion to dismiss for lack of personal jurisdiction. (DE 107). On January 30, 2018, I denied that motion. (DE 119, 120).

During October 2017, the parties again pursued various ongoing discovery disputes. (DE 116).

On March 6, 2018, plaintiffs filed a second premature motion for summary judgment (DE 121). Magistrate Judge Hammer administratively

3

terminated that motion on May 9, 2018, for having been filed in violation of the amended pretrial scheduling order.[3] (DE 127; *see also* DE 36).

### b. Defects in the parties' submissions

On August 28, 2018, plaintiffs filed the motion for partial summary judgment that is now before the Court. (DE 133). On October 15, 2018, Defendants filed an opposition that was not procedurally compliant. (DE 142 to 146; *see* DE 150). On December 28, 2018, I filed an amended order striking the defendants' opposition for failure to comply with L. Civ. R. 56.1, and granting defendants leave to re-file their opposition. (DE 150).[4] On January 31, 2019, defendants refiled their opposition to plaintiffs' motion for summary judgment. (DE 153). On February 11, 2019, plaintiffs filed their reply to defendants' opposition (DE 158), and, on February 19, 2019, plaintiffs filed an amended version of that reply. (DE 161).

In support of their briefs, each party has submitted documents that do not conform with Fed. R. Civ. P. 56 and the Local Civil Rules. In light of the history of this action I will survey some of the governing procedures.

First, Fed. R. Civ. P. 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Second, the Local Civil Rules require that:

> Affidavits, declarations, certifications and other documents of the type reference in 28 U.S.C. § 1746 shall be restricted to statements of fact within the personal knowledge of the signatory. Argument of the facts and the law shall not be contained in such documents. Legal arguments and summations in such documents will be disregarded by the Court and may subject the signatory to appropriate censure sanctions or both.

---

[3] At that time, Magistrate Judge Hammer also administratively terminated defendants' motion to compel discovery for having been filed in violation of the Pretrial Scheduling Order. (DE 127).

[4] For similar reasons, I also struck defendants' motion for summary judgment (DE 138), which they have amended (DE 155), and which I will consider separately.

L. Civ. R. 7.2(a). Finally, Local Civil Rule 56.1 requires that in statements of material facts and responsive statements, the parties must cite to "affidavits and any other documents in support of that motion." The court expects that parties will meaningfully comply with Loc. Civ. R. 56.1 by, *inter alia,* providing specific page or paragraph citations to the record, and more critically, by coherently identifying the documents that are cited. *See e.g., Perez v. Camden Municpal Court,* No. 14-cv-7473 (RBK/JS), 2016 WL 7338524, at *1 n. 3 (D.N.J. Dec. 19, 2016) (noting that defendants "repeatedly cite[d] to exhibits without identifying page or paragraph numbers, including a deposition transcript that totals more than 60 pages. Such indefinite citations hamper the Court's responsibility to identify whether disputes of material fact exist, and the Court cautions that other courts in this District have disregarded facts that are not properly attributed to the record").

I now discuss some of the shortcomings in the parties' factual submissions on this motion.

First, in support of summary judgment, plaintiffs have submitted the affidavit of plaintiff Paul Williams. (DE 133-3). In violation of L. Civ. R. 7.2(a), the affidavit is littered with legal and factual argument. (*See, e.g.,* 133-3 p. 7 ("Defendants cannot unjustly benefit from the work Plaintiffs performed on their behalf. . . . Plaintiffs asks the Court to award reasonable attorney's fees and pre and post-judgment interest on any amount the Court will award."). Mr. Williams includes a critique of each instance in which he believes the defendants gave "false/inconsistent statements" that "go to their credibility." (*See* DE 133-3 p. 8–10).[5] At certain points, however, Mr. Williams properly sets forth actual facts based on his personal knowledge—and those I will consider.

---

5       The affidavit reads, at certain points, more like a brief. Mr. Williams, although he has been *pro se* on-and-off in this action, is a law school graduate. (*See id.* p. 1) ("I am a 1997 graduate of the University of Texas (at Austin) School of Law"). On this summary judgment motion, he has at all times been represented by counsel.

5

Second, I consider the attorney's certification of defendants' counsel, Steven B. Irwin. (DE 154). First, Mr. Irwin does not appear to possess personal knowledge of any of the events alleged in this action. Second, Mr. Irwin submits legal arguments in the guise of facts. His certification states under penalty of perjury, for example, that "Plaintiff's summary judgment motion . . . should be denied in its entirety" (DE 154 ¶ 10); that "virtually all of the material facts are in dispute" (*id.* at ¶ 9); and that "Plaintiff's memorandum of law submitted as part of their summary judgment motion contains statements that are blatantly untrue." (*id.* ¶ 2)).[6] I will disregard such statements in the Irwin Certification. *See* Fed. R. Civ. P. 56(c)(4) and L. Civ. R. 7.2(a).

Finally, both parties have, in other instances, failed to meaningfully comply with L. Civ. R. 56.1. The flaws range from the merely discourteous to the substantive.

Plaintiffs, in their statement of facts, have broadly cited to exhibits consisting of collections of emails, without page citations. (*See* PRDR ¶ 1 (citing Ex. B)). Plaintiffs' statement of facts frequently cites to the problematic Williams affidavit, *see supra,* adding to the difficulty. Several of the paragraphs in plaintiffs' reply statement of facts are purely rhetorical. (*See, e.g.,* PRDR ¶¶ 5, 10).

Most egregiously, plaintiffs' briefs cite alleged "material facts" that are nowhere to be found in their statement of material facts.[7] (*E.g.,* DE 133-2, 158. *See* L. Civ. R. 56.1.) Such facts cannot be treated as undisputed; by omitting them from the Rule 56.1 statement, plaintiffs have (1) deprived the defendants of the opportunity to properly respond and (2) failed to properly define and narrow the issues for the Court.

---

[6] One statement in Mr. Irwin's certification is arguably based upon actual personal knowledge, as it involves the progress of discovery. (DE 154 ¶ 7). Mr. Irwin states that "[p]laintiffs have never produced any document relating to a joint venture between the parties." (DE 154 ¶ 7).

[7] Plaintiffs' statement of facts is only ten paragraphs long. (PSOF).

6

Defendants, too, have failed to support many of their factual assertions in their responsive statement of facts. (*See e.g.,* DR ¶¶ 4–6, 9–10). In addition, defendants cite to misidentified exhibits. (*See* DR ¶ 5 (citing to "Exb. B.")[8]

### c. Material facts

Each party purports to "dispute" nearly every material fact, in the trivial sense of gainsaying everything its opponent says. They do not, however, consistently do so within the bounds of Rule 56, *i.e.,* by citing to particular items of evidence that create a material issue of fact. What follows is an attempt to identify key factual disputes.

### i. The parties

Mr. Williams is a consultant who owns a New Jersey-based business. (PSOF, DR ¶ 3). His business is listed as an Authorized Representative under the Antigua Citizenship by Investment Program.[9] (*Id.*). (I gather, although it is unclear from the statement of facts, that the party named as Mr. Williams's co-plaintiff in this action is that business.) (*Id.*).

---

[8] This "Exhibit B" is said to be a one-page contract. Searching the record for likely candidates, I find that (1) defendants' opposition does not include an Exhibit B at all; (2) defendants' prior, stricken opposition Exhibit B is a list of authorized representatives in Antigua; and (3) plaintiffs' Exhibit B is a string of e-mails that does not include the alleged contract. Nevertheless, I find a contract that fits the description attached to defendants' motion to dismiss (DE 107) and as Exhibit A to defendant's prior, stricken opposition. (DE 142 pp. 16–18).

[9] Mr. Williams has testified that he is an authorized representative and that a person cannot apply to CIP without one. (Williams Dep. 13:22, 14:24). I also take judicial notice of the Government of Antigua and Barbuda webpage dedicated to CIP. *See* Fed. R. Evid. 201(b) (providing that a court may take judicial notice of a fact "that is not subject to reasonable dispute"). Under "How to Apply," the government states: "we would recommend that you approach a[n] [authorized] representative in the first instance. . . . They will provide you with expert guidance, explain the application process in detail, and assist you in preparing your application and associated documentation. . . . They will engage with a licensed agent based in Antigua and Barbuda who will review your application and arrange to submit in person along with the required payments due. . . ." GOVERNMENT OF ANTIGUA & BARBUDA, How to Apply, CITIZENSHIP BY INVESTMENT UNIT, http://cip.gov.ag/how-to-apply/ (last visited Mar. 20, 2019 4:00pm). The internet archive's Wayback Machine confirms that the content of the website has been substantially consistent as far back as December 16, 2013. *See* https://web.archive.org/web/20131217155354/http://cip.gov.ag:80/how-to-apply/

Plaintiffs allege that the defendants "are in the business of placing Chinese nationals in other countries – whether for study or residency – via immigration policies in those countries." (PSOF ¶ 2) (citing to Zhou Dep., p. 38: 7 – 17, 43: 21 – 25; Tian Dep. Pt. I, p. 16:1–3, 63:12–21). Defendants say that they dispute this. In his deposition, however, Mr. Tian affirmed that, when he met Mr. Williams, he told Williams that his business "involved securing applications for economic citizenship for Chinese nationals for different countries around the world and [he was] considering Antigua." (Tian Dep. Pt. 1 p. 63: 12–21). (*See also* DR ¶ 2 (stating that, through his Hong Kong Company, Jiahao International Group Ltd. (Jig), Mr. Tian represents Asian nationals seeking to obtain citizenship in foreign countries) (citing Tian Dep. Pt. 1 35:8)).

On the same topic, defendants dispute that defendant Ms. Zhou is in the business of placing Chinese nationals in foreign countries. (DR ¶ 2) (citing Zhou Dep. pp. 11:6, 38:2, 35:20). According to defendants, Ms. Zhou separately operates Ed-Wise, her own business in Flushing, New York, which helps students prepare application packages for admission to the United States college or university of their choice. (*Id.*) (citing Zhou Dep. p. 11:6). Ms. Zhou herself, however, in her deposition, states that when she does educational consulting, she assists foreign applicants with visa applications, and she acknowledges that she engages in a form of "immigration type consultancy services." (Zhou Depo, p. 38:1–17).

The affidavits and depositions do genuinely clash as to whether Mr. Tian and Ms. Zhou were business partners (or at least if they represented to Mr. Williams that they were business partners). Mr. Williams has submitted an affidavit swearing that Ms. Zhou represented herself to Mr. Williams as Mr. Tian's business partner. (DE 133-3 p. 3). Defendants, however, assert that Ms. Zhou is not involved in Mr. Tian's business except as his English-Mandarin interpreter. (DR ¶ 2 (citing Zhou Dep. 38:2, 35:20). *See also* Zhou Dep. pp. 35:12–25, 36:1–25, 37:1–2 (Ms. Zhou affirming that her only job for Mr. Tian and Jiahao was to act as a translator, and that, to this day, her business relationship with Mr. Tian is only as his interpreter)). Further, Ms. Zhou

testified that she was not Mr. Tian's or Jiaho's partner (Zhou Dep. pp. 12: 10–15, 33:7–15), and that she did not state to Mr. Williams that she was Mr. Tian's partner (Zhou Dep. p. 18: 11–23). However, she also testified that she does not remember if she failed to correct Mr. Williams when he referred to her as the partner of Mr. Tian. (Zhou Dep. 23: 14–17). [10]

### ii. First contact

Mr. Tian testified that, sometime between April and May 2014, he initially contacted Mr. Williams, using Ms. Zhou as his interpreter. (Tian Dep. pp. 36:1–25, 37:1–13). As discussed *supra*, it is disputed whether, at any point, Ms. Zhou was represented to be a partner of Mr. Tian. The parties agree that their first conversation related to the Antigua Citizenship by Investment Program ("CIP"). (PSOF, DR, PRDR ¶ 1). They dispute, however, what the defendants specifically sought from Mr. Williams. (*Id.*).

Mr. Williams alleges that defendants contacted him to represent them in obtaining "favorable incentives" from the Antigua Government with respect to the CIP. (PSOF ¶ 1) (citing to Williams Affidavit; Tian Dep. pp. 35–36).

---

[10] Mr. Tian's deposition is less than crystal clear:

- **Q.** Did you ever tell anybody that Ying Zhou was your partner?
- **A.** No.
- **Q.** Did you ever authorize Ying Zhou to tell anyone including Mr. Williams that she was your partner?
- **A.** I relayed her to Mr. Williams in that capacity.

  **Mr. Irwin.** If he doesn't understand the question.

- **A.** I don't quite understand your last question.
- **Q.** Did Tony ever authorize Ying Zhou to tell anyone including Mr. Williams that she was his partner?
- **A.** No, I didn't.
- **Q.** Would you be surprised to learn that Ying Zhou had been representing herself as your partner?
- **A.** It could not have happened.

(Tian Dep. p. 62: 3–17).

Specifically, the plaintiffs assert, defendants "wished to have Plaintiffs act as their intermediary to encourage the Antigua Government to grant them special concessions under the CIP in exchange for Defendants providing a significant number of applications." (PRDR ¶ 1) (citing Ex B, E-mails to Defendants, DE 133-8; Ex. BB, Mr. William's Text Messages with Translator, DE 133-11).

Defendants deny that they contacted Mr. Williams to "represent them in obtaining favorable incentives from the Antigua government." (DR ¶ 1) (citing Williams Dep. 13:22, 14:24). Rather, defendants assert, they contacted Mr. Williams because he was an "authorized representative" and a person cannot apply for CIP without an "authorized representative." (*Id. See also* PSOF, DR ¶ 3.).

### iii. New Jersey meeting

At some point, the parties met in person in New Jersey. (PSOF, DR, ¶ 4). Plaintiffs allege that, at this first meeting, the parties "discussed ways in which Plaintiff could lend value to Defendants as Defendants sought favorable incentives under the Antigua [CIP]." (PSOF ¶ 4 (citing Williams Affidavit, DE 133-3; "Attorney's Certification for Defendant Guoloiang Tian in Defendants' Motion to Dismiss filed with this Court on 8/13/2017")). I pause to consider plaintiffs' second citation, which is to a document submitted with defendants' motion to dismiss. (DE 107). There, Mr. Tian's attorney certified on behalf of Mr. Tian that Mr. Williams told Mr. Tian that he was a relative of the Prime Minister of Antigua (DE 107 p. 6 ¶ 5 (citing Tian Dep. p. 44:13)), and that "he had connections with the (Antiguan) government and that he could have the (applicant) fee reduced from $200,000.00 to $150,000.00." (*Id.* (Tian Dep. p. 60:9). It is not proper for the court to rely on a certification of an attorney, Mr. Irwin, to the effect that he has properly summarized statements made in Mr. Tian's deposition. (DE 107 p. 5). I have, however, inspected the underlying Tian deposition, and found that it does contain those facts.[11] Mr. Tian also testified

---

11     I caution the parties to refrain from submitting similar attorney certifications in the future.

that at the New Jersey meeting, he and Mr. Williams stated "he will give our business a break" (Tian Dep. 41:12–17), and that he could use his connections with the Antiguan government to reduce the donation fee to $150,000. (Tian Dep. 42: 1–6). Defendants assert that this fact is "disputed" because it is vague (DR ¶ 4), but they cite to nothing in the record.

### iv. Alleged oral joint-venture agreement and written contract

The plaintiffs claim that, at their initial meeting in New Jersey, the parties entered into an oral agreement. (PSOF, DR, PRDR ¶ 5). Mr. Williams states in his affidavit that, in the New Jersey meeting, the parties "set forth the general terms of an oral joint venture agreement." (DE 133-3 p. 3). From the plaintiffs' point of view, the most important material term of that oral agreement was that Mr. Williams would be the defendants' exclusive representative. That meant that the defendants would not solicit or accept on their own behalf any new applicants seeking CIP advice. In exchange, Mr. Williams would seek for the defendants more favorable terms or concessions under the CIP from the Antigua Government. (DE 133-3 p. 4).

The defendants deny the oral agreement, and claim that the relationship was governed by a one-page written contract. (DR ¶ 5 (citing "Exb. B")). The plaintiffs do not deny that such a document exists, but they say it is not a contract, but merely a letter of intent. (PRDR ¶ 5). Neither party proffers an intelligible citation to the place in the record where this document may be found.[12]

I have searched the record and located something that seems to fit the description of the alleged written contract (or a purported translation of it). It is

---

[12] As discussed above, defendants have failed to direct the court to any relevant "Exhibit B." (DE 160-1 p. 23). The plaintiffs assert that they "remain confident that the Court will examine all of the evidence previously provided to arrive at its own logical conclusion." (Id.). To both parties, I note that, on summary judgment, the parties' duty is to narrow the issues before the court—not to send the Court on a fact-finding safari of its own. See Local Civ. R. 56.1(a).

attached to the defendants' earlier motion to dismiss. (DE 107). In an e-mail from Mr. Williams to his translator, Williams states as follows:

> Please translate the following for Mr. Tony Tian and have him return it to me (copying you) as soon as possible. Thanks
>
> 'I, Tony Tian, agree to pay Paul Williams a consultancy fee in the amount of US $12,000 for each application submitted to the Antiguan Citizenship by Investment Program under the National Development Fund option. This consultancy fee represents compensation for services rendered by Mr. Williams and his company, MAKSWILL GROUP CORPORATION. This fee is contingent upon Mr. Williams negotiating with the Antiguan Government a reduction in the standard contribution to the National Development Fund to an amount of US $150,000 for each application delivered to the CIP Unit by Mr. Tian and his company prior to June 4, 2014.
>
> **The consultancy fee shall be paid as follows: (1) Upon approval by the Antiguan Government of the reduction in the contribution to the National Development Fund, US$2,000 per application shall be paid immediately to Mr. Williams with each application submitted to the CIP Unit; (2) The remainder of the fees (US 10,000 per application) shall be paid to Mr. Williams at the same time the applicants submit their full contribution to the Fund after they have been approved by the Government for citizenship.**
>
> Signed: Tony Tian (JIAHAO INTERNATIONAL GROUP, LIMITED).[']

(DE 107 p. 15. *See also* Exhibit A to defendant's prior, stricken opposition (DE 142 pp. 16–18).) Defendants have also submitted a document, bearing an apparent date of May 19, 2014, which for the most part is not in English. (DE 107 p. 16). There is no hand-signature on the document, but there seems to be a stamp of some kind. (*Id.*).

### v. Travel to Antigua

On some occasion or occasions, Mr. Tian, Ms. Zhou and Mr. Williams were together in Antigua. (PSOF ¶ 6).[13] In a rare moment of concord, the

---

[13] With no citation to the record, the defendants assert that the parties traveled separately. (DR ¶ 6). Defendants seemingly assert that they did not meet Mr. Williams in Antigua, but any such statement is not supported by the record. Defendant Mr.

parties acknowledge that defendants never paid plaintiffs' travel and related expenses. (PSOF, DR ¶ 7).

The purpose of the parties' trip (or trips) to Antigua remains in some dispute. (PSOF, DR, PRDR ¶ 6). Plaintiffs assert that the parties traveled to Antigua to "meet with government officials on the island, including the former Prime Minister and current Prime Minister." (PSOF ¶ 6) (citing Tian Dep. Pt. II, p. 77: 10–13 (testifying that he has not met any government officials from Antigua without Mr. Williams present); Zhou Dep. pp. 29:7–25, 30:1). Defendants assert that Mr. Tian's "primary objective in travelling to Antigua was to register for the Antiguan CIP program, not to meet the Prime Ministers." (DR ¶ 6 (citing to nothing in the record)).

Defendants seem to be quibbling about the "primary" purpose for the visit; they do not forthrightly deny that they did meet government officials once they were on the island. Indeed, the defendants at times acknowledge that they met with Antiguan government officials during their trips.[14] Defendants assert that, on the first trip, Mr. Williams introduced defendants to his relative, former Prime Minister Spencer. (DR ¶ 6 (citing Tian Dep. p. 44:15)) Defendants state that this meeting was not preplanned, but cite to nothing in the record. Defendants acknowledge that, on the second Antigua trip, they met Prime Minister Browne, and that Mr. Williams told them Browne visited them in their hotel room to see if Mr. Tian's offer was serious enough to merit special consideration. (DR ¶ 6 (citing Williams Dep. 74:19)).[15]

---

Tian testified, for example, that he had been in Antigua with Mr. Williams twice. (Tian Dep. Pt. I, p. 74:1–8. *See also* Pl's Ex. B, E-mails, DE 133-8 pp. 4–5 (Mr. Williams and Ms. Zhou coordinating a hotel booking at the Blue Water Hotel (at $795/night each room) in order to make a good impression on former Prime Minister Spencer). Further, Ms. Zhou testified that "[Mr. Williams] went to [Antigua] with us . . .. How many times, I don't remember." (Zhou Dep. p. 32:7–13).

14   Ms. Zhou testified that she recalls one meeting with the former Prime Minister Baldwin Spencer, but cannot recall a meeting with current Prime Minister Gaston Browne or the Attorney General Steadroy Benjamin. (Zhou Dep. pp. 29–30).

15   Again citing nothing, defendants assert that any such meeting was a more chance, casual affair. They met with Prime Minister Browne, they say, because "Antigua, being a small, island nation, the incumbent Prime Minister would make it a

There is an additional dispute of fact regarding certain real estate investment options in Antigua. Plaintiffs assert that Mr. Williams showed Ms. Zhou and Mr. Tian "real estate development options that [he] had acquired for property that the Defendants had expressed interest in developing on the island." (PSOF ¶ 8) (citing Zhou Depo p. 17:11–15; Williams Affidavit). Defendants state that this was merely a case of Mr. Williams accompanying them when they visited real estate on the island. (DR ¶ 8 (citing Zhou Dep. p. 17:11–15 (affirming that she remembers Mr. Williams accompanying her and Mr. Tian to various land plots in Antigua for proposed real estate ventures on the island).

### vi. Mr. Tian and Jiahao become CIP authorized representatives

At some point (it is not clear whether it happened before or after the parties' relationship dissolved), Mr. Tian and Jiahao became representatives and developers of the Antiguan CIP program. (PSOF, DR ¶ 9). Plaintiffs assert that this occurred as a result of Mr. Williams's efforts. (PSOF ¶ 9 (citing to Ex. X, DE 133-21; Tian Dep. p. 87: 16–18)). Plaintiffs' supporting citations to the record, however, merely confirm that Mr. Tian and Jiahao are authorized representatives, not that their status as representatives resulted from Mr. Williams's efforts. (*See* DE 133-21; *see also* Tian Dep. p 87). Defendants, also with no citation to the record, assert that they became representatives without Mr. Williams's help, simply by using the Antiguan CIP website. (DR ¶ 9). Further—and again citing to nothing in the record—the defendants assert that once Mr. Williams found that the Mr. Tian had applied for CIP sponsorship, he "cancelled the parties' contract." (DR ¶ 9).

### vii. Breach of the alleged oral joint venture agreement

According to plaintiffs, starting on August 14, 2014, the defendants breached the exclusivity term of the oral joint venture agreement by soliciting

---

priority to meet a person like Mr. Tian. The Antiguan economy would benefit substantially if Mr. Tian provided individuals to invest in its CIP program." (DR ¶ 6).

other agents on the island of Antigua. (PSOF ¶ 10 (citing Williams Affidavit)). It remains a dispute of material fact whether the defendants breached the exclusivity provision of the alleged oral joint venture agreement. Of course, as discussed *supra*, it is disputed whether there was an oral joint venture agreement at all. (PSOF, DR, PRDR ¶ 10).

## II. Discussion

### a. Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). That is, the moving party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

On the other hand, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v.*

15

*Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552).

To demonstrate the existence of a genuine issue, a party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Likewise, "unsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, a party must present evidence sufficient to create a triable issue. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). By evidence, the Rule means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In construing such evidence, however, the court must draw inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

### b. Analysis

Count One of the amended complaint—not the subject of this motion—asserts a claim of breach of contract. Plaintiffs move for summary judgment only on Counts Two and Three. (DE 133-2 p. 6 ("Plaintiff is filing this Motion for Summary Judgment, with notice to the Court, on Counts Two and Three of the Amended Complaint.")). Counts Two and Three seek recovery on the bases

of unjust enrichment and quantum meruit for the value of the services and labor plaintiffs provided and the expenses they incurred on behalf of defendants. (DE 81 pp. 4–5).

"'Quantum meruit,' which literally means 'as much as is deserved,' is applied when, absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super 278, 286, 926 A.2d 387 (App. Div. 2007) (citations omitted). To recover under a theory of quantum meruit, a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of the services by the entity to which they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Coldwell Banker Commercial/Feist & Feist Realty Corp. v. Blancke P.W. L.L.C.*, 368 N.J. Super. 382, 401, 846 A.2d 633 (App. Div. 2004) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) ). However, "[i]t has long been recognized that the existence of an express contract excludes the awarding of the relief regarding the same subject matter based on quantum meruit." *Kas Oriental*, 394 N.J. Super at 286, 926 A.2d 387.

To prove a claim for unjust enrichment, "a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'" *Thieme v. Aucoin-Thieme*, 227 N.J. 269, 151 A.3d 545, 557 (2016) (*quoting Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 110, 922 A.2d 710 (2007). This doctrine of quasi-contract also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond what would have been its contractual rights. *Id.* (quoting *Iliadis*, 191 N.J. at 110, 922 A.2d 710). *See also Ebner v. Statebridge Co., LLC*, No. 16-8855, 2017 WL 2495408, at *9 (D.N.J. June 9, 2017) (noting that restitution for unjust enrichment is an equitable remedy and only available when there is no express contract providing for remuneration).

My analysis of quantum meruit and unjust enrichment is much the same.

First, plaintiffs' statement of facts fails to specify the nature and value of benefits, let alone establish that they are undisputed. (*See* PSOF). It remains disputed or wholly unclear whether the plaintiffs, by accompanying the defendants on trips or to meetings with government officials, conferred any benefit at all on the defendants. Nor does the source of any obligation or expectation of payment appear, unless that obligation arises from a contract, the existence of which is disputed. Neither party attempts to any value to whatever benefit was supposedly conferred. I cannot grant a party as much as they deserve if they do not tell me what they believe they are owed.[16]

Second, Defendants argue that as a matter of law the Court should not adjudicate claims of quantum meruit and unjust enrichment when there is a claim of breach of contract still pending.[17] (DE 153). These equitable remedies are primarily backstops; the classic case would be an agreement later found void for public policy reasons after one party has paid or performed. I will not resort to backstop equitable remedies when the parties are still litigating the existence of a contractual agreement governing the alleged benefit-conferring activities. *See, e.g., Baer v. Chase*, 392 F.3d 609, 617 (3d Cir. 2004) (holding that "express contract and implied-in-fact contract theories are mutually exclusive.").

Ordinarily, breach of contract, if claimed, is considered first; only if the contract claim fails will the court consider quasi-contractual remedies, to prevent any resulting injustice. *See PNY Techs., Inc. v. Salhi*, No. 12-cv-4916,

---

[16] To some extent plaintiffs may be relying inappropriately on factual allegations in Mr. Williams's affidavit or in the plaintiffs' briefing. Such facts will not be considered. They do not appear in the statement of material facts, which deprived the defendants the opportunity to properly dispute them. *See* L. Civ. R. 56.1.

[17] It is unclear whether either party can show that a governing contract existed. Both claim, however, that it did. Plaintiffs allege that an oral joint-venture agreement governed; defendants, whose summary judgment motion has not yet been heard, rely on a one-page written agreement. *See* Section I.c.iv, *supra*.

2018 WL 1087496, at *2 (D.N.J. Feb. 28, 2018) ("[W]hen parties to contract lack a meeting of the minds, a court may find the contract void and award damages, not based upon the existence of a contract, but rather based on a quasi-contractual theory of quantum meruit.") (internal citations omitted); *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222 (D.N.J. 1994) (Holding that, if a gambling patron could maintain an action against a casino based on allegation that there was "no meeting of the minds," the absurd result would be that the unsuccessful gambler would be entitled to return to the *status quo ante,* before he lost his bet.)

Here, the plaintiffs ask me to circumvent their very-much-alive breach of contract claims and hop to their alternative arguments for equitable relief. Under the circumstances, that would be improper; a decision as to breach of contract (and *which* contract) is logically prior to the factual issues underlying Counts Two and Three. Accordingly, plaintiffs' motion for summary judgment on Counts Two and Three is denied.

### III. Conclusion

For the reasons set forth above, the motion (DE 133) for summary judgment of plaintiffs Paul Williams and Makswill is DENIED. An appropriate order accompanies this Opinion. I am simultaneously filing a procedural order governing the defendants' motion for summary judgment.

Dated: March 27, 2019

**Kevin McNulty**
**United States District Judge**