**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

**PAUL WILLIAMS and MAKSWILL GRP. CORP.**

　　　　　**Plaintiffs,**

**v.**

**YING ZHOU, GUOLIANG TIAN, and JIHAHAO[1] INT'L GRP., LTD.**

　　　　　**Defendants.**

---

Civ. No. 14-5544 (KM) (MAH)

**OPINION**

---

**KEVIN MCNULTY, U.S.D.J.:**

　　　This matter between Plaintiffs, Paul Williams and Makswill Group Corporation ("Makswill"), and the Defendants, Ying Zhou, Guoliang Tian, and Jiahao International Group, Ltd. ("Jiahao") has been pending since September 2014. It is an object lesson in the consequences of failure to embody a commercial relationship in a clear written contract. This action, moreover, has been plagued by procedural missteps from counsel on both sides. By way of background to Defendants' renewed motion for summary judgment and the Plaintiffs' cross-motion for summary judgment, I highlight some of this matter's relevant procedural history.

　　　The parties have collectively moved (or attempted to move) for summary judgment eight times. (*See* DE 10; DE 121 & 122; DE 133 & 134; DE 138 & 139; DE 168; DE 176; DE 189; DE 194) All but the currently pending motions have been terminated or denied by this Court, often for failure to comply with the Local Civil Rules of this district and the Federal Rules of Civil Procedure. (*See* DE 72; DE 127; DE 150; DE 164; DE 165; DE 166; DE 185) For example,

---

[1]　　　The parties render this name, I assume correctly, as "Jiahao." The clerk is directed to correct the caption.

on March 14, 2016, when administratively terminating the first summary judgment motion, I admonished the plaintiff as follows:

> The motion for summary judgment was filed some 7 days after the complaint had been answered. It is premature, and it lacks the statement of undisputed facts as required by Local Rule 56.1. It raises multiple issues of fact about the formation of the alleged contract, in advance of any discovery. . . . The court may deny or defer summary judgment motion when opposing discovery has not had the opportunity for discovery so it can marshal the necessary facts. See Fed. R. Civ. P. 56(d). Leave to file summary judgment motions shall be sought from the Magistrate Judge when discovery is complete.

(DE 72)

Three years later, I provided additional guidance. For clarity, I outlined exactly what was deficient about the motions as submitted, this time focusing on the Defendants:

> THIS MATTER having come before the Court upon the motion of Plaintiffs Paul F. Williams ("Williams") and Makswill Group Corporation ("Makswill") (DE 133) for summary judgment and. the motion of Defendants Ying Zhou ("Zhou"), GuoliangTian ("Tian"), and Jihahao International Group, Ltd. ("Jihahao") for summary judgment (DE 138, 139); and

> IT APPEARING that Local Civil Rule 56.1(a) requires that a motion for summary judgment include a numbered statement of material facts, cited to the relevant portions of the record, and that the opposition to a motion for summary judgment include a responsive statement of material facts; and

> IT FURTHER APPEARING that, under Local Civil Rule 56.1(a), "[e]ach statement of material facts shall be a separate document (not part of a brief] and shall not contain legal arguments or conclusions of law"; and

> IT FURTHER APPEARING that Defendants' motion (DE 138, 139) for summary judgment does not include a statement of material facts not in dispute pursuant to Local Civil Rule 56.1; and

> IT FURTHER APPEARING that Defendants' opposition (DE 142 to 146) to Plaintiffs motion for summary judgment does not furnish a responsive statement of material facts not in dispute pursuant to Local Civil Rule 56.1; . . . .

(DE 150) I therefore ordered the Defendants' motion for summary judgment stricken. (*Id.*) I further ordered that the Defendants' papers in opposition to Plaintiffs' motion be stricken and granted leave to refile an opposition that conformed with L. Civ. R. 56.1. Ultimately, this order had no effect on the parties' compliance. Both sides' briefing failed to conform with Fed. R. Civ. P. 56 and L. Civ. R. 56.1. Therefore, on March 25, 2019, I issued an opinion and order outlining in detail how the parties failed to comply with the local rules and I ultimately denied the Plaintiffs' motion for summary judgment. (DE 164 at 4–7, 19; DE 165)

Six weeks later, on May 14, 2019, Defendants filed another motion for summary judgment. (DE 168) Plaintiffs then cross-moved for summary judgment. (DE 176) Again, these motions failed to meaningfully comply with Rule 56 or Local Rule 56.1. Therefore, at a conference held on October 8, 2019, Magistrate Judge Hammer outlined the deficiencies in the papers that were hampering the Court's efforts to identify the material facts that remained in dispute. The motions were then administratively terminated. (DE 185) Judge Hammer issued an order, which would be redundant in most cases, requiring that any subsequent summary judgment motion conform to the rules:

> As discussed during the telephone conference held on the record on October 8, 2019, any renewed motion for summary judgment shall be filed by November 15, 2019, any opposition shall be filed by December 15, 2019, and any reply shall be filed by January 7, 2020. If the parties file cross-motions for summary judgment, they shall strictly adhere to Local Civil Rule 7.1(h). So Ordered by Magistrate Judge Michael A. Hammer on 10/9/2019

(DE 186) Defendants then sought an extension to file a "revised" summary judgment motion. (DE 187) Judge Hammer granted that request and again reminded the parties that "All papers must comply with Local Civil Rules 7.1, 7.2, and 56.1." (DE 188)

This Court has given ample warning(s) that it expects counsel to comply with applicable rules when submitting motions for summary judgment. Now pending before this Court is the Defendants' renewed motion for summary

judgment (DE 189) on all Counts of the Amended Complaint (DE 81) and Plaintiffs' cross-motion for summary judgment (DE 194).

These motions, too, fall well short of procedural requirements, though not quite as far short as their predecessors. I have more or less thrown up my hands at this point and considered the motions as presented.

## I.   Background[2]

The parties have revised prior briefing but only incompletely corrected the flaws specifically identified by this Court. For example, the brief submitted by Mr. Irwin on behalf of Defendants makes factual assertions that are not cited to the statement of material facts (where indeed they do not appear), or to the record. (*Compare* DSOF *with* DE 189 at 3–9.) Likewise, the Defendants often fail to cite to any evidence when denying Plaintiffs' statement of material facts. (*See* DRSOF, *passim.*) Plaintiffs for their part frequently refer to facts in their cross-motion that do not appear in their statement of facts, or cite to facts without reference to any supporting evidence in the record. (*Compare* PSOF with DE 194-1 at 12–21)[3]

---

[2]   For ease of reference, certain key items from the record will be abbreviated as follows:

"DSOF" = Defendants' Statement of Undisputed Material Facts (DE 190)

"PRSOF" = Plaintiffs' Response to DSOF (DE 194-2)

"PSOF" = Plaintiffs' Statement of Fact submitted with their cross-motion (DE 194-3)

"DRSOF" = Defendants' Response to PSOF (DE 196)

"Tian Dep." = Deposition of Tony Tian (DE 193 & 193-1)

"Williams Dep." = Deposition of Paul Williams (DE 192)

"Williams Aff." = Affidavit in support of plaintiffs' opposition to defendants' summary judgment motion filed by Paul Williams (DE 194-4)

"Zhou Dep." = Deposition of Ying Zhou (DE 193-2)

[3]   Less seriously, Plaintiffs inconveniently refer the Court to their prior summary judgment motion rather than separately citing the record here. (*See* DE 194-1 at 5, 9–11; DE 164 (March 2019 Summary Judgment Opinion) at 18–19)) Plaintiffs chastise Defendants for doing precisely the same.

In general, I give no weight to any factual statements made by either party that are not properly cited to the record. *See* L. Civ. R. 56.1(a). Where record support is apparent, however, I have tried to cite it on my own.

### a. The Parties

Plaintiff Paul Williams is a consultant who owns a New Jersey-based business, plaintiff Makswill Group Corporation. (PSOF ¶ 1) His business is listed as that of an Authorized Representative under the Antigua Citizenship by Investment Program ("CIP"). (*Id.*) CIP offers a path to Antiguan citizenship to foreign persons who invest in Antigua through such vehicles as the National Development Fund, real estate investments, or business investments.[4]

Plaintiffs allege that the Defendants "are in the business of placing Chinese nationals in other countries – whether for study or residency – via immigration policies in those countries." (PSOF ¶ 2) (citing to Zhou Dep., p. 38: 7 – 17, 43: 21 – 25; Tian Dep. Pt. I, p. 16:1–3, 63:12–21). As in their prior briefing, Defendants claim to "dispute" this fact, although they again fail to point the Court to any contrary evidence.

In any event, Defendants' response makes clear that there is no dispute as to the following: Defendants Mr. Tian and Mrs. Zhou assist foreign nationals with two forms of immigration consultancy services—one for study and the other for residency through financial investment programs. (*See id.*; DRSOF ¶ 2). Indeed, in his deposition, Mr. Tian affirmed that, when he met Mr. Williams, he told Williams that his business "involved securing applications for economic citizenship for Chinese nationals for different countries around the world and [he was] considering Antigua." (Tian Dep., p. 63: 12–21).[5]

---

[4]     *See* https://cip.gov.ag/investment-options/real-estate/. While Defendants appear to have chosen to invest in Antigua via the National Development Fund, they also appeared to be discussing potential real estate business investments on the island. They have left it unclear what connection these real estate ventures may have with the CIP application process.

[5]     I therefore cannot imagine what the "dispute" consists of, beyond the reflexive gainsaying of what the opposing party says. Needless to say, such an approach has little to do with the applicable summary judgment standard.

On the same topic, Defendants claim that there is a factual dispute as to whether Ms. Zhou is in the business of placing Chinese nationals in foreign countries. (DRSOF ¶ 2 (citing nothing in the record)) Again, the alleged dispute is difficult to pinpoint; Ms. Zhou herself testified in her deposition that when she does educational consulting, she assists foreign applicants with visa applications, and she acknowledges that she engages in "immigration type consultancy services." (Zhou Dep., p. 38:1–17).

The affidavits and depositions continue to clash, however, as to whether Mr. Tian and Ms. Zhou were business partners, or, relatedly, whether they represented to Mr. Williams that they were business partners.

Ms. Zhou asserts that she is not involved in Mr. Tian's business except as his English-Mandarin interpreter. (Zhou Dep., pp. 38:2, 35:20; *see also* Zhou Dep., pp. 35:12–25, 36:1–25, 37:1–2 (Ms. Zhou affirming that her only job for Mr. Tian and Jiahao was to act as a translator, and that, to this day, her business relationship with Mr. Tian is only as his interpreter)). Mr. Tian also testified that he is the sole owner of Jiahao and that it has eight employees, none of whom is Ms. Zhou. (Tian Dep., pp. 16-17; DSOF ¶ 4). Mr. Tian needed a translator because he does not speak or read English. (DE 189 at 6)[6]

By contrast, Plaintiffs continue to point to evidence that Ms. Zhou allowed Mr. Williams to believe that she was Mr. Tian's business partner. Plaintiffs cite an initial email exchange between Mr. Williams and Ms. Zhou in which she does not correct Mr. Williams's reference to her as Mr. Tian's partner. (PSOF ¶ 3–5; *see also* Williams Dep., p. 18; DE 194-7 at 3 (an April 1, 2014, email from Mr. Williams to Ms. Zhou stating that "it was very nice to meet you and your partner Tony on Sunday . . . I look forward to doing business in Antigua with you very soon."); DE 194-6 at 16 (Ms. Zhou replying

---

[6]     Despite statements that Mr. Tian does not speak or read English, Mr. Tian submits an affidavit in English without a Chinese translation or any other indicia that the statements in the affidavit were ever translated into Chinese for him to confirm their accuracy. (DE 191 at 1)

to Mr. Williams and stating that "I called my associate in China. Currently we have potential clients, but they didn't make their final decisions yet. We are still waiting. Once we have, I will let you know."))

Defendants' latest statement of facts fails to cite any evidence to meaningfully dispute the content of these emails or the statements in PSOF ¶¶ 3-5. *McCann v. Unum Provident*, 921 F. Supp. 2d 353, 359 (D.N.J. 2013), *aff'd*, 907 F.3d 130 (3d Cir. 2018)("[F]ailure to reference evidence of record demonstrates that there is no reason to disbelieve the statements of fact contained in the Paragraphs at Issue." (citation omitted)). I will deem it admitted, then, that Ms. Zhou did not correct Mr. Williams when he referred to Ms. Zhou as Tony Tian's partner and that Ms. Zhou referred to Tony Tian as her "associate." (PSOF ¶¶ 3–5)

### b. Facts

#### i. First contact

The parties have made some progress in limiting the number of disputed factual statements concerning their initial contacts, although they still fail to provide key facts about these early encounters.

Mr. Tian testified that, sometime between April and May 2014, he initially contacted Mr. Williams, using Ms. Zhou as his interpreter. (Tian Dep. pp. 36:1–25, 37:1–13) Defendants found Mr. Williams online on a "website." Here, Tian may be referring to the website listing registered CIP representatives. (Tian Dep. p. 38) The parties agree that Defendants were the ones to set up the initial meeting with Williams. (DSOF ¶ 2) The parties also agree that their first conversation related to the Antiguan CIP. (PSOF ¶ 6) Mr. Williams adds that Defendants wanted him to represent them in obtaining "favorable incentives" from the Antigua Government with respect to the CIP. (*Id.*)

At some point, the parties met in person in New Jersey and "discussed ways Plaintiff could assist Defendants as Defendants sought favorable incentives under the Antigua [CIP]." (PSOF, DR, ¶ 6) Mr. Tian testified that at

this meeting in New Jersey, Mr. Williams referred to a connection within the Antiguan government, and Williams stated that he could assist Mr. Tian in getting "our business a break." (Tian Dep., p. 41:12–17) Specifically, Williams said he could use his connections with the Antiguan government to reduce the "donation fee" from $200,000 to $150,000. (Tian Dep., p. 42: 1–6) This may be a reference to a contribution to the National Development Fund.

At their initial meeting, the parties admit, they discussed the number of CIP applicants Mr. Tian could potentially provide, although the number is disputed. Plaintiffs aver in their briefing (but not in their SOF) that Tian promised at that meeting to provide as many as 200 applicants annually for Mr. Williams to process. (*See, e.g.*, 194-1 at 29) Mr. Tian testified that he stated at that meeting that *if* Mr. Williams could secure the reduction of the fee from $200,000 to $150,000, *then* he could provide 20 to 30 applicants per year. (Tian Dep., pp. 43:24-44:4; *see also* PSOF ¶11)

The parties both add—neither citing any evidence—that at some point they also met in New York to discuss getting clients processed under the CIP program. (DSOF ¶ 2)

### ii.  Alleged oral joint-venture agreement and written contract

The Plaintiffs claim that Mr. Tian declined to sign any formal written agreements regarding their business relationship (DE 194-6 at 16); the only term placed in writing was the $12,000 per-applicant commission, an apparent reference to a one-page document discussed *infra*. (PRSOF ¶ 3) Nevertheless, say the Plaintiffs, at their initial meeting in New Jersey, the parties entered into an oral agreement. (PRSOF ¶ 2) Mr. Williams's statement of facts does not discuss the terms of the oral agreement; his affidavit, however, states that, in the New Jersey meeting, the parties "set forth the general terms of an oral joint venture agreement." (DE 194-4 ("Williams Aff.") p. 3) From the Plaintiffs' point of view, the key term of that oral agreement was that Mr. Williams would be the Defendants' exclusive representative with respect to the CIP program. By that

they meant that Defendants would not work with other authorized CIP representatives and Mr. Williams would not work with any other clients. On Defendants' behalf, Williams would seek favorable terms under the CIP from the Antigua Government—specifically that, for applicants that the Defendants brought to Williams, Williams would obtain a reduction in the dollar amount of the National Development Fund contribution. (*Id.* p. 4)

The Defendants deny that they had an oral agreement with Williams. They claim that the relationship was governed solely by a one-page written document, which they characterize as a contract. (DSOF ¶¶ 3–5 (citing "Exb. A-1, A-2")) The Plaintiffs do not deny that such a document exists. They say, however, that this is not a valid contract because Mr. Tian unilaterally altered the payment term from $12,000 to $10,000 and because it does not constitute the parties' complete agreement. Williams says, for example, that he could not get Tian to agree to provide him with a retainer or a cooperation agreement to account for the work he was doing. (Williams Aff. ¶ 37) Williams thus avers that the one-page document was no more than a reduction to writing of a specific payment term based on the number of applications Tian was to provide. (PRSOF ¶¶ 3–5)

This document, it is now clear, appears in the record. (*See, e.g.*, DE 189 at 25-27 "Exb. A-1" and "A-2") "Exb. A-2" bears a date of May 19, 2014, and is for the most part not in English. (DE 189 at 27) There is no hand-signature on the document, but there seems to be a stamp, which Mr. Tian says is his personal stamp. (DE 191 (Tian Affidavit) ¶ 8) What Defendants contend is an English translation of this document is an unmarked document found at "A-1," which reads as follows:

> Please translate the following for Mr. Tony Tian and have him return it to me (copying you) as soon as possible. Thanks
>
> 'I, Tony Tian, agree to pay Paul Williams a consultancy fee in the amount of US $12,000 for each application submitted to the Antiguan Citizenship by Investment Program under the National Development Fund option. This consultancy fee represents compensation for services rendered by Mr. Williams and his

company, MAKSWILL GROUP CORPORATION. This fee is contingent upon Mr. Williams negotiating with the Antiguan Government a reduction in the standard contribution to the National Development Fund to an amount of US $150,000 for each application delivered to the CIP Unit by Mr. Tian and his company prior to June 4, 2014.

> **The consultancy fee shall be paid as follows: (1) Upon approval by the Antiguan Government of the reduction in the contribution to the National Development Fund, US$2,000 per application shall be paid immediately to Mr. Williams with each application submitted to the CIP Unit; (2) The remainder of the fees (US 10,000 per application) shall be paid to Mr. Williams at the same time the applicants submit their full contribution to the Fund after they have been approved by the Government for citizenship.**

Neither party explains why this contract or document apparently covered only a two week period, from May 19, 2014 to June 4, 2014.

### iii.  Travel to Antigua

On some occasion or occasions, Mr. Tian, Ms. Zhou, and Mr. Williams were all together in Antigua. (PSOF ¶ 13)[7] The parties acknowledge that Defendants never paid Plaintiffs' travel and related expenses (or, presumably, vice versa). (PSOF, DRSOF ¶ 14)

The purpose of the parties' trip (or trips) to Antigua continues to be in some dispute. (PSOF, DRSOF ¶ 13) Plaintiffs assert that the parties traveled to Antigua to "meet with government officials on the island, including the former Prime Minister and current Prime Minister." (PSOF ¶ 13) Defendants deny that they went to Antigua to meet with the Prime Minister specifically, but do not deny that they were interested in meeting government officials once they were on the island. (DRSOF ¶ 13) Some meetings with officials seem to have

---

[7]     Defendants stress that the parties traveled separately but do not cite anything to support this. (DRSOF ¶ 13) The materiality of this detail is not immediately apparent; testimony establishes that Mr. Williams helped coordinate the travel and that, by whatever means, they wound up together in Antigua. (Tian Dep. Pt. I, p. 74:1–8; Zhou Dep. p. 32:7–13 ("[Mr. Williams] went to [Antigua] with us . . . How many times, I don't remember."))

occurred, although the details of these meetings and even the identities of the officials are for the most part omitted. Mr. Williams asserts in his affidavit that the parties met with former Prime Minister Baldwin Spencer—seemingly by happenstance, as Williams had no prior relationship with P.M. Spencer. (Williams Aff. ¶ 23) Williams states that the parties also met with Spencer's successor, Prime Minister Gaston Browne. (*Id.* ¶¶ 29, 31)

Mr. Williams avers that while in Antigua, he purchased real estate options on the island for Defendants to invest in. (PSOF ¶ 15) Defendants deny that Mr. Williams acquired various property on the island for Mr. Tian, but their denial does not cite to the record. (PSOF, DRSOF ¶ 15)

### iv.  The alleged breach of the oral joint venture agreement

At some point (whether before or after the parties' relationship dissolved is not quite clear), Defendants Tian and Jiahao themselves became representatives and developers under the Antiguan CIP program. (PSOF, DR ¶ 22) The claim seems to be that this happened without the aid of Mr. Williams, although the facts are again not clearly stated by either side. According to Williams, he was then circumvented, in violation of the oral joint venture's exclusivity provision. On August 14, 2014, he says, the Defendants began "colluding with local officials and agents in Antigua to ensure that they achieved their goals without having to pay Plaintiffs." (Williams Aff. ¶ 26) Defendants allegedly met directly with other local CIP agents and other officials on the island whom they had met through Williams. (PSOF ¶ 24 (citing Williams Aff., DE 194-4))

Defendants say they were justified in acting as they did because Mr. Williams failed to uphold his end of the bargain. (I believe they refer here to the one-page document.) Williams never secured a reduced CIP processing fee from $200,000 to $150,000, or provided any substantiation for his claim that he could use his influence to do so.[8]

---

[8]     It is unclear what connection Mr. Williams had to any government officials or to Antigua, apart from the fact that his sister lived on the island. (Williams Aff. ¶ 23)

As for redress, Plaintiffs highlight three points: (1) that Mr. Tian never provided applicants for Williams to process; (2) that Plaintiffs believed the relationship was supposed to last for five years; and (3) that Mr. Williams spent a significant time and effort negotiating on behalf of Defendants, for which Plaintiffs should be compensated.

First, as noted above, the written agreement (which, remember, has a term of two weeks) does not commit Mr. Tian to supply any particular number of applicants. Plaintiffs say he orally agreed to 200; Tian admitted to estimating 20 or 30, *if* Mr. Williams obtained the discount from the Antiguan government. Either way, it is clear that Tian never brought Mr. Williams any potential clients to process. (Tian Dep. pp. 51:17–25) Thus, say Plaintiffs, even if the Court accepts Defendants' view that the one-page written document is binding and enforceable, Mr. Tian's failure to provide any applicants placed Defendants in breach of it.[9]

---

Williams admits in his affidavit that he had to work at arm's length to negotiate with the Antiguan officials because he had "no inside knowledge nor personal relationships with any of the parties." (*Id.*) At the same time, Plaintiffs assert in their briefing that they conferred a benefit to Defendants through their negotiations with Antiguan officials in that "It is unlikely that Defendants would have been able to navigate these discussions and meetings in a foreign land without Plaintiffs' assistance (or the assistance of a similarly well-connected professional on the island)." (DE 194-1 at 34–35) Williams's own admissions establish that he was not well-connected on the island, and was unable to secure the required discount for Defendants, who ultimately used other CIP agents on the island to help them with their application.

[9]     As discussed below, Mr. Tian's obligations under the written agreement were contingent "upon Mr. Williams negotiating with the Antiguan Government a reduction in the standard contribution to the National Development Fund to an amount of US $150,000 for each application delivered to the CIP Unit by Mr. Tian and his company prior to June 4, 2014." (DE 189 at 25-27)

> Q.  Were you thinking more than 5, more than 10, more than 20, 100, 1,000?
>
> A.  Understood, for the number of clients would be decided based on how benefit our treatment we might have before I decide -- before I can tell who might be interested.

Tian Dep., p 43:9-14

> A.  I told him if the price was good enough we could send 20 customers or 30 customers.

Second, Mr. Williams states in his affidavit that the parties' business relationship was supposed to last for five years. (*See* Williams Aff. ¶ 39, DE 194-1 at 29.) The only evidence to which Mr. Williams points, however, is "Exhibit G." Exhibit G merely states that "any real estate purchased under CIP must be held by the applicants for at least 5 years." (DE 194-5 at 2) This statement has nothing to do with the duration of the parties' relationship.

Third, on August 22, 2014, Mr. Williams sent Defendants a letter terminating the oral agreement and enclosing an invoice for his services. (DE 194-7 at 15–17) The invoice demanded payment for services rendered and expenses that amounted to approximately $322,500. The invoice detailed the following work and expenses: 1,120 hours worked for Defendants, travel expenses to Antigua (approximately $14,000), travel to NYC and other venues, translator fees, and "other" fees. (DE 194-7 at 17 (Ex. K, invoice dated August 22, 2014)) Mr. Williams previously provided phone records to substantiate his claim that he spent over 100 hours on the phone with various individuals from April 2014 to August 2014. (DE 133-25 to 133-45)

### c. The Claims

The Amended Complaint contains three counts:

Count 1 (breach of contract)

Count 2 (unjust enrichment)

Count 3 (quantum meruit)

---

Tian Dep., p 44:1

> Q.  But do you know if he was able to negotiate anything with the Antiguan Government to drop it to $150,000 from $200,000?
>
> A.  That's his effort.  I don't know, he said he could do it.  I don't know how he did it.
>
> Q.  But did you ever bring anybody did you ever bring any Chinese applicants to Antigua?
>
> A.  No, since he was not successful how could I bring people in.

Tian Dep., p 51:12-20

> There is no evidence that Mr. Williams was successful in reducing the fee.

Under Count 1, Plaintiffs assert that they have performed under "the Agreements," that Defendants have "failed to make payment to Plaintiffs for services they have performed [and] costs they have incurred", and that as a direct result of Defendants' breach, they have suffered damages. (Compl. ¶¶ 20–23)

Under Count 2, Plaintiffs allege that they have conferred a benefit upon Defendants. They allegedly provided services and incurred expenses, which Defendants accepted without compensating Plaintiffs. (*Id.* ¶¶ 24–32)

Finally, under Count 3, Plaintiffs state that they have performed consulting services and incurred costs for which Defendants promised to pay the reasonable value. (*Id.* ¶¶ 33–37)

Under each count, Plaintiffs seek judgment in the amount of $322,500, the amount of the August 2014 invoice.[10]

## II.   Discussion

### a.   Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242,

---

[10]   The claims in the complaint are quite clear: Plaintiffs are not suing for the expected profits from their arrangement with the Defendants, but for the reasonable value of services provided and costs incurred, as invoiced.

Mr. Williams belatedly states in his affidavit that the parties' business relationship was supposed to last for five years, and that he is owed expectancy damages, *i.e.,* the commissions he would have earned for 30 applications per year processed in that period. (See Williams Aff. ¶ 39, DE 194-1 at 29.) That claim, even if it had been asserted, would not succeed. The only evidence to which Mr. Williams points in support of the agreement's five-year term is "Exhibit G." Exhibit G merely states that "any real estate purchased under CIP must be held by the applicants for at least 5 years." (DE 194-5 at 2) This statement has nothing to do with the duration of the parties' relationship.

The Defendants' duty to supply applicants, moreover, was contingent upon the Plaintiffs' obtaining the discount from $200,000 to $150,000 of the Antiguan government's fee. That never occurred.

14

247–48, 106 S. Ct. 2505, 2509–10 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). That is, the moving party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

On the other hand, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552).

To demonstrate the existence of a genuine issue, a party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Likewise, "unsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, a party must present evidence sufficient to create a triable issue. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has

provided sufficient evidence to allow a jury to find in its favor at trial."). By evidence, the Rule means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In construing such evidence, however, the court must draw inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

### b. Analysis

As I see the claims, they line up as follows.

*First*, there is a potential claim of breach of the one-page contract, or document. This document, which states that Plaintiffs will present applicants and pay a consultancy fee of $12,000 (or $10,000) apiece in return for Defendants' assistance in prosecuting their applications in Antigua. There are concurrent conditions. The document provides that Defendants' obligations are contingent upon Plaintiffs' negotiation of "a reduction in the standard contribution to the National Development Fund to an amount of US $150,000 for each application delivered to the CIP Unit by [Defendants] prior to June 4, 2014."

Strangely, Plaintiffs deny that this was a contract, citing, *inter alia*, failure to agree on the price term; strangely, Defendants admit that this was a contract, in the apparent hope that it will subsume the Plaintiffs' claim of a broader, oral agreement. But fundamentally, what would a claim of breach of this written contract consist of? There is no evidence that Plaintiffs presented Defendants with a single potential client before June 4, 2014 (or, for that

matter, thereafter); the parties' concurrent, or mutually dependent, duties to perform did not arise. The discount was never obtained; there were never any clients. (*See* discussion in Section II.b.i, *infra.*; *see generally* Compl. ¶¶ 20–37)

*Second*, there is a potential claim of breach of the parties' alleged oral agreement. Defendants deny the agreement's existence. Even in Plaintiffs' accounting, however, the terms are fairly vague: It was to continue beyond the June 4, 2014 deadline of the written document, and Defendants would become "exclusive clients" of Plaintiffs. That, according to Plaintiffs, meant that, in connection with negotiating the fee with the Antiguan government, Defendants would not work with any other CIP agents. In return, Plaintiffs would accept clients only from Defendants, and would not "solicit nor accept any [other] new clients seeking CIP advice during the period that Plaintiffs represented Defendants." (DE 194-1 at 14; DE 194-4 (Williams Aff.) at 2–3) As noted, there is no evidence that Defendants ever located or presented to Plaintiffs any such "clients."

The claim of breach in Count 1 bears this out. What Plaintiffs are suing for is not the per-client fee. Rather, Mr. Williams seeks $322,500 based on 1,120 hours worked, travel expenses to Antigua, travel to NYC and other venues, translator fees, and "other" fees. But Plaintiffs point to no agreement, written or oral, regarding payment of hourly compensation or expenses; that alleged obligation seems to have been invented *post hoc*, because Plaintiffs thought it fair that they should be compensated. That is very different from saying that the failure to pay an hourly fee or expenses constituted a breach of some agreement. Such a claim would require evidence of an agreement that such items would be paid by Defendants. I see no such evidence. (*See* discussion in Section II.b.i, *infra.*)

*Third*, Plaintiffs sue in quasi-contract on theories of *quantum meruit* and promissory estoppel. These claims at least have the merit of appearing to correspond in some way to the damages sought, *i.e.*, travel expenses and hourly compensation for Plaintiffs' efforts. The claim would be that, even

17

absent a specific contractual undertaking, Defendants induced Plaintiffs to incur expenses for which they should be compensated. I find, however, no evidence that any such expectation would have been justified. (*See* discussion in Section II.b.ii, *infra.*)

### i.  Count 1

Count 1 of the amended complaint asserts a claim of breach of contract. The amended complaint refers to a "verbal [meaning oral] services agreement authorizing and directing Plaintiffs to be an intermediary in official discussions with senior members of the Antiguan government including its Prime Minister." (Compl. ¶ 11) The amended complaint does not refer specifically to any other agreement, but Count 1 asserts that Defendants have breached "the parties' Agreements," phrased in the plural. (*Id.*¶ 22)

Defendants contend that there is no such oral agreement. The only agreement potentially at issue, they say, is a one-page document drafted by Mr. Williams, which Mr. Williams had translated into Chinese, and which Mr. Tian endorsed with his personal stamp. (DSOF ¶¶ 3–4) The only terms of that one-page agreement were (a) that Williams was to receive $12,000 (or possibly $10,000) for each client successfully processed under the CIP program and (b) that Williams would negotiate a reduced CIP contribution of $150,000 per client (apparently the standard fee would have been $200,000). (DE 189 at 10)[11] Defendants further contend that the contract, as drafted by Williams, did not provide a "yearly quota" for the number of clients to be processed under the agreement, and that the agreement expired after just two weeks, on June 4, 2014. (*Id.*) No exclusivity term appears in the document.

Plaintiffs state that there was never a meeting of the minds regarding the one-page draft contract. They point out that the version of the document

---

[11]    At his deposition, Mr. Tian stated that the Chinese version of the contract provided that *if* Mr. Williams was able to negotiate a reduced CIP fee of $150,000 per person, *then* Mr. Tian would pay him $10,000—not $12,000—per application. (Tian Dep., p. 48:13–25 (further quoted at pp. 12–13 n. 10, *supra*).

returned by Defendants included an altered price term; in essence, they contend that Plaintiffs sent not an acceptance but a counteroffer that the price be reduced from $12,000 to $10,000. There is no evidence, say the Plaintiffs, that Mr. Williams accepted this counteroffer. (DE 194-1 at 6; DE 194-7 at 10 (Ex. H))[12]

To prevail on a breach of contract claim, a party must prove (1) the existence of valid contract between the parties, (2) the opposing party's failure to perform a defined obligation under the contract, and (3) the breach caused the claimant to sustain damages. *EnviroFinance Grp., LLC v. Envtl. Barrier Co., LLC*, 440 N.J. Super. 325, 345 (N.J. Super. Ct. App. Div. 2015) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (N.J. Super. Ct. App. Div. 2007)). All three elements are at issue on these summary judgment motions.[13]

**Written Agreement**

I first deal with the contention that the parties had a written contract that was breached. The first key issue is contract formation: *i.e.*, whether there was an agreement about the fees that were to be paid for the services provided and what those services would be. The second is whether any such agreement, if it occurred, was breached.[14]

---

[12]    Plaintiffs, without citing to any case law, seem to be asserting that Defendants have waived their right to rely on documents because they did not refer to them in their answer to the amended complaint, or that Defendants' failure to present affirmative defenses disables them from opposing summary judgment here. (DE 194-1 5–6) These positions are unfounded. Defendants' answer did deny the critical factual allegations of the amended complaint, including the allegations of breach of contract. (DE 167) Those are the factual allegations being tested on this summary judgment motion. Failure to refer or attach specific documents to the answer (Plaintiffs did not cite them in their complaint, either) does not bar a party from relying on them on summary judgment. Indeed, the very purpose of discovery, which generally occurs after the pleading stage, is to uncover evidence for use on summary judgment or at trial. *See* Fed. R. Civ. P. 26.

[13]    All agree that whatever negotiations occurred took place in New Jersey. The parties do not contend that anything other than New Jersey law applies to the agreements at issue here. Accordingly, I will apply New Jersey contract law.

[14]    As noted above, Defendants—unusually, in my experience—claim that there *was* a written contract. As best I can understand their position, Defendants wish this one-page document not only to be effective but to subsume the parties' dealing, and

"For a contract to be enforceable there must be a meeting of the minds for each material term to an agreement." *In re Rappaport*, 517 B.R. 518, 529 (Bankr. D.N.J. 2014) (internal quotations and citations omitted). The requirements of a meeting of the minds "is 'an essential element to the valid consummation of any contract.'" *Id.* at 530 (quoting *Ctr. 48 P'ship v. May Dep't Stores Co.*, 355 N.J. Super. 390, 406, 810 A.2d 610 (N.J. Super. Ct. App. Div. 2002)). This requirement is met when "there has been a common understanding and mutual assent to all the terms of a contract." *Id.* A contract is not legally enforceable without this "common understanding" of the terms. *Marcangelo v. Boardwalk Regency Corp.*, 847 F.Supp. 1222, 1229–30 (D.N.J. 1994) (quotation omitted). To have a meeting of the minds, both parties must manifest that they understand what each is agreeing to do or not to do, and the "contracting party is bound by the apparent intention he or she outwardly manifests to the other party." *Brawer v. Brawer*, 329 N.J.Super. 273, 283, 747 A.2d 790 (N.J. Super. Ct. App. Div. 2000) (quoting *Hagrish v. Olson*, 254 N.J.Super. 133, 136, 603 A.2d 108 (N.J. Super. Ct. App. Div. 1992)). "Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280, 284 (1992) (citing *Heim v. Shore*, 56 N.J.Super. 62, 72–73, 151 A.2d 556 (N.J. Super. Ct. App. Div. 1959) (holding agreement unenforceable because parties did not agree on terms of payment, principal amount of mortgage, due date, and interest rate)).

Contract formation and essential terms rest on propositions of fact which must be assessed on a summary judgment standard. *See McDonnell v. Engine Distributors*, 314 F. App'x 509, 511 (3d Cir. 2009) (citing *Burlew v. Hepps*, 6 N.J. Super. 16, 19 (App. Div. 1949)) ("The formation of an enforceable contract

─────────────────

crowd out any claim of an oral contract, which they seem to regard as the greater threat. Plaintiffs assert that this written document was not an effective agreement. To the extent it was a contract at all (which they dispute), it was not a fully integrated contract. The parties' relationship, in Plaintiffs' view, was and continued to be governed by a broader "verbal [*i.e.,* oral] agreement," discussed in the following section. That seems to be the real meaning of this dispute.

is a question of fact"); *American Lumber & Mfg. v. Atlantic Mill & Lumber Co.*, 290 F. 632, 634 (3d Cir. 1923) (recognizing that "[w]hen the evidence is conflicting it is for the jury to determine whether a contract does in fact exist, and, if so, what are its terms?"). When parties perform under a contract without objection, a court will sometimes find agreement—*i.e.,* the Court will infer what the parties agreed to do based on what they did. *See James v. Zurich-Am. Ins. Co. of Illinois*, 203 F.3d 250, 255 (3d Cir. 2000)(stating that where an agreement is silent on a particular term, a course of dealing may fill the void); *Trianco, LLC v. Int'l Bus. Machines Corp.*, 583 F. Supp. 2d 649, 662 n.9 (E.D. Pa. 2008), *aff'd*, 347 F. App'x 808 (3d Cir. 2009)("[A] party's partial performance can be used to show intent to be bound to an agreement."). Should a party thereafter fail to perform, a breach may be found. Here, however, there is no track record of performance. *See infra.*

Here, the essential price term remains disputed—Defendants contend that the contract called for Mr. Williams to be paid $12,000 per applicant, while Mr. Williams contends that in the version of the written contract Mr. Tian returned, Tian amended the price to $10,000. Defendants' response to this factual dispute is less than clear. They do not explicitly deny that the version of the agreement that Mr. Tian returned contained the lower price. (DRSOF ¶ 9) Instead, the Plaintiffs deflect, stating (without citing to any evidence) that the price negotiation was somehow obscured by Plaintiffs' own interpreter. (*Id.*) They further maintain that Mr. Tian thought the contract paying Mr. Williams $12,000 per applicant was valid and binding. (DE 195 at 4) No one explains why it had a term of only two weeks. Neither party provides the actual emails that were sent to and from Mr. Tian showing the precise documents exchanged. Instead, Plaintiffs submit a version of the agreement in English and a version of the agreement in Chinese with Mr. Tian's stamp.

There is more than an after-the-fact failure to agree regarding the facts, however. This evidence fails to demonstrate that there was a contemporaneous agreement as to the key term of price.

Even assuming that contract formation is a disputed issue that could be tried, however, there is a fundamental problem with the element of breach. If this document was a contract, it had the following terms: Defendants were to locate potential clients and to pay the Plaintiffs $12,000 (or $10,000) per client in return for Plaintiffs' assistance with negotiating their applications in Antigua. Defendants' duty to furnish clients, however, was dependent on Plaintiffs' obtaining a reduced fee from the Antiguan government. But there is no evidence that Plaintiffs were successful in negotiating this fee or that they even had a reasonable prospect of doing so. Accordingly, Defendants never presented Plaintiffs with a potential client before the June 4, 2014 expiration date (or indeed thereafter). In short, performance of this executory contract never got off the ground. The duty to pay commissions did not arise, and failure to pay them is not a breach.

Perhaps in recognition of this problem, Plaintiffs do not sue for the per-client fee in their amended complaint. Rather, they seek a per-hour fee for work performed and travel expenses in connection with their ultimately fruitless efforts to influence the Antiguan government. But there is nothing at all in this one-page document addressing hourly compensation or reimbursement of expenses.

Too much is in doubt here. That may be a failure of available evidence, or of advocacy. Nevertheless, I cannot find that there was a written agreement—or, more to the point, that this document, if it was an agreement, was breached by the failure to pay expenses or an hourly fee for Mr. Williams's time.

**Oral Agreement**

Plaintiffs claim that there was an oral agreement which applied in lieu of, or in addition to, the one-page document cited above.

There is little evidence of the alleged oral agreement. The main source of information is Williams's affidavit (DE 194-4). As Williams describes it, the agreement had the following elements: (1) it was entered into in April 2014, around the time of the parties' first in-person meeting, and did not, like the written agreement, expire in June 2014; (2) "Defendants would become

exclusive clients of Plaintiffs as Plaintiffs sought more favorable rates under the CIP with the Antigua Government"; (3) "Plaintiffs opted to make Defendants their exclusive client and did not solicit nor accept any new clients seeking CIP advice during the period that Plaintiffs represented Defendants." (DE 194-1 at 14; DE 194-4 (Williams Aff.) at 2–3) Mr. Williams submits emails from himself to Defendants which, in his view, reflect such terms as exclusivity. (*See, e.g.*, DE 194-7 at 11 (June 30, 2014 email from Williams to Tian stating ". . . Otherwise, you can continue to partner with my company as your exclusive Authorized Representative.")) Any responses from Defendants are not provided, however, so these emails provide no evidence that the understanding was bilateral—*i.e.,* that there was agreement on them.

Mr. Williams does not seem to assert that the parties orally agreed to the precise payment terms. The per-client charge (whether $10,000 or $12,000) does not seem to be pressed here (since there were no clients). (*See, e.g.*, DE 194-1 at 14, 18.) Nevertheless, Mr. Williams asserts that for breach of that oral agreement he is owed approximately $322,500 based on 1,120 hours worked for Defendants, travel expenses to Antigua, travel to NYC and other venues, translator fees, and "other" fees. These charges are claimed on an invoice Mr. Williams sent the Defendants, dated August 22, 2014. (DE 194-7 at 17 (Ex. K, an invoice from August 22, 2014)) Previously, Mr. Williams attempted to substantiate these claims with records of travel expenses and phone records showing he spent over 100 hours on the phone with various individuals from April 2014 to August 2014. (DE 133-25 to 133-45)

That some sort of an oral contract may have existed rises to the level of a disputed issue, but no farther. An oral contract must satisfy the basic elements of any contract: 1) mutual assent or "meeting of the minds," 2) consideration from both parties, and 3) terms that are "sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Shogen v. Global Aggressive Growth Fund, Ltd.*, 2007 WL 1237829, at *14 (D.N.J. Aug. 3, 2007) (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J.

427, 435, 608 A.2d 280 (1992)). A contract is enforceable if the parties "'agree on the essential terms and manifest an intention to be bound by those terms.'" *Weichert*, 608 A.2d at 284. Under New Jersey law,

> Parties may orally, by informal memorandum, or by both agree upon all the essential terms of the contract and effectively bind themselves thereon, if that is their intention, even though they contemplated execution later of a formal document to memorialize their undertaking. The ultimate question is one of intent.

*McBarron v. Kipling Woods, LLC*, 365 N.J. Super. 114, 116, 838 A.2d 490 (N.J. Super. Ct. App. Div. 2004) (quoting *Comerata v. Chanmont, Inc.*, 52 N.J.Super. 299, 305, 145 A.2d 471 (N.J. Super. Ct. App. Div. 1956)). However, "[t]he Court will not grant summary judgment when there is a material issue of fact as to whether an enforceable oral contract exists in the first place." *Schecter v. Schecter*, No. 07-419, 2008 WL 5054343, at *4 (D.N.J. Nov. 26, 2008)

It is clear from the record before me that Williams continued to negotiate and work on Mr. Tian's behalf past the June 4, 2014 date that the written agreement purportedly terminated. That, on a plaintiff-favorable interpretation, might be evidence of some sort of continuing oral agreement. However, this "agreement" could also have consisted of nothing more than evolving negotiations that were never consummated. There is little to suggest that Williams and Tian ever agreed on all the terms of their business relationship, including the services Williams would provide with respect to Tian's affairs in Antigua. (*See, e.g.*, DE 194-6 at 13 (April 16, 2014 email from Mr. Williams to Ying Zhou stating that "I think I will need to revise the cooperation agreement now that I more clearly understand what you and Tian are proposing for the real estate development.")) Moreover, while Mr. Williams contends that the parties agreed to keep their relationship exclusive, Defendants continue to dispute that any such term was never agreed to, and there is no independent evidence of it.

I will assume that there is evidence sufficient to raise a triable issue as to the existence of an oral contract. Here, as in the case of the written agreement,

the real problem is the issue of breach. The claimed breach of the oral agreement consists of Defendants' failure to pay Mr. Williams a total of $322,500 in fees for hours worked, as well as travel and other expenses. Even in Mr. Williams's account, the oral agreement never included a commitment to pay him on an hourly basis, a rate per hour, or any agreement to pay his expenses. Nor did the business of applying on behalf of Chinese clients ever so much as get started. There is literally no evidence cited of a connection between the claimed terms of the contract and the claimed breach of contract.

In sum, Plaintiffs' cross-motion for summary judgment on Count 1 (breach of contract) is **denied**, and Defendants' motion for summary judgment on Count 1 is **granted**.

### ii.  Counts 2 and 3

Counts 2 and 3 of the Amended Complaint assert theories of quantum meruit and unjust enrichment. My March 2019 opinion stated the essential elements of those theories and suggested the manner in which the proofs, as they then stood, were insufficient:

> "'Quantum meruit,' which literally means 'as much as is deserved,' is applied when, absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust." *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super 278, 286, 926 A.2d 387 (App. Div. 2007) (citations omitted). To recover under a theory of quantum meruit, a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of the services by the entity to which they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Coldwell Banker Commercial/Feist & Feist Realty Corp. v. Blancke P.W. L.L.C.*, 368 N.J. Super. 382, 401, 846 A.2d 633 (App. Div. 2004) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994)). However, "[i]t has long been recognized that the existence of an express contract excludes the awarding of the relief regarding the same subject matter based on quantum meruit." *Kas Oriental*, 394 N.J. Super at 286, 926 A.2d 387.
>
> To prove a claim for unjust enrichment, "a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit

without payment would be unjust.'" *Thieme v. Aucoin–Thieme*, 227 N.J. 269, 151 A.3d 545, 557 (2016) (*quoting Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 110, 922 A.2d 710 (2007). This doctrine of quasi-contract also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond what would have been its contractual rights. *Id.* (quoting *Iliadis*, 191 N.J. at 110, 922 A.2d 710). *See also Ebner v. Statebridge Co., LLC*, No. 16-8855, 2017 WL 2495408, at *9 (D.N.J. June 9, 2017) (noting that restitution for unjust enrichment is an equitable remedy and only available when there is no express contract providing for remuneration).

My analysis of quantum meruit and unjust enrichment is much the same.

First, plaintiffs' statement of facts fails to specify the nature and value of benefits, let alone establish that they are undisputed. (*See* PSOF). It remains disputed or wholly unclear whether the plaintiffs, by accompanying the defendants on trips or to meetings with government officials, conferred any benefit at all on the defendants. Nor does the source of any obligation or expectation of payment appear, unless that obligation arises from a contract, the existence of which is disputed. Neither party attempts to [] value [] whatever benefit was supposedly conferred. I cannot grant a party as much as they deserve if they do not tell me what they believe they are owed

(DE 164 at 17–18)

Here, the key issues are whether Mr. Williams conveyed a benefit to Defendants when he provided services, whether any value can be attributed to these services, and whether Mr. Williams had a legitimate expectation of being compensated for these services.

It is clear that Mr. Williams expended significant efforts to pursue a business plan with Defendants involving the CIP program. Notwithstanding that he did not have any prior relationship with any Antiguan officials, Williams states that he conferred a benefit in that he "opened up the doors of the highest levels of the Antiguan government and introduced these officials to these Defendants. Defendants were present when Mr. Williams advocated their

case, in person, to Antiguan government officials and discussed ways by which the Antiguan Government could benefit if Defendants provided large numbers of applications to the CIP." (DE 194-1 at 31 (citing nothing in the record)) Mr. Tian's request to pay a reduced CIP fee essentially required him to lobby local governmental officials to change the law. Accordingly, Mr. Williams asserts that he spent "a lot of time "to research local laws, consult with the Attorney General and others to either (i) find a suitable framework within those laws to accede to Defendants' request, or (ii) amend the local CIP laws, with the assumption it would provide greater financial benefit to the Antiguan people." (*Id.* at 33–34 (citing Williams Dep.))[15]

There is some evidence in the record of Mr. Williams's advocacy efforts:

- A series of emails beginning in April 2014 concerning a letter Mr. Williams planned to send to the Antiguan Prime Minister regarding the parties' proposal (*see* DE 194-5 at 21 ("Exhibit F"));

- An April 27, 2014 investment proposal letter sent to Prime Minister Spencer (*see* DE 194-6 at 7);

- A May 26, 2014 letter from the officer of the Prime Minister of Antigua outlining Mr. Williams's proposal on behalf of Mr. Tian, namely that Mr. Tian would provide 15 applicants per month in exchange for a $150,000 cap on the contribution to the national development fund (DE 194-5 at 4 ("Exhibit B"));

- An August 17, 2014 email from Mr. Williams to Defendants outlining the state of his negotiations with the Antiguan government and stating that Williams was aware that Defendants planned to travel to Antigua alone to meet with the officials Mr. Williams had introduced them to. (*Id.* at 11 ("Exhibit D")); and

- An August 19, 2014 email to the Prime Minister attaching a CIP draft agreement (*Id.* at 7 ("Exhibit C").

---

[15]   Mr. Williams also contends that he spent two days touring Mr. Tian around the island of Antigua to show him plots of land that were ripe for real estate development and as a result, Plaintiffs purchased options valued at $4,000 for undeveloped lots that the parties were going to try to develop together. (DE 194-1 at 34–35) The parties point to no evidence that Mr. Tian was able to set up certain real estate investments based on Mr. Williams's efforts or to use this in connection with CIP applications.

(*See also* PSOF ¶ 23)

Ultimately, however, aside from some introductions to government officials, there is no evidence of any benefit to Defendants, and any value to them that flowed from these services. Defendants do not deny that after Mr. Williams introduced Mr. Tian to Antiguan officials, Mr. Tian subsequently arranged his own meetings with these same officials. (Williams Aff. ¶¶ 26–27, 33) However, the record does not disclose that Mr. Tian built on Mr. Williams's efforts or succeeded in obtaining discounted CIP contribution rates. Moreover, there is no evidence that Mr. Williams himself had any success in negotiating a reduced rate on the CIP processing fees. And, certainly, there have been no individuals' CIP applications processed.

More concerning is the fact that there is no evidence that *either* party understood that Mr. Williams expected to be compensated based on an hourly rate for his services. All the evidence points to a joint venture, in which Mr. Williams undertook to obtain favorable terms from the Antiguan government, the Defendants would provide applicants who were willing to pay, and Williams would get a consulting fee based on completed transactions. What Plaintiffs are attempting to do is to transform this speculative joint venture into a fee-for-(unsuccessful) services arrangement. There is no evidence that the parties discussed or expected an hourly rate of compensation, that Mr. Williams undertook his negotiation efforts based on an understanding that he would be paid hourly, or that should the scheme fail, Mr. Williams would nevertheless be compensated for his efforts—any more than Defendants would have been entitled to have Williams pay their travel expenses or time expended in locating applicants. In short, all the evidence suggests a joint venture in which the parties took the risk that it would not pan out, in return for the possibility of rich rewards if it did.

Accordingly, Plaintiffs' cross-motion for summary judgment on Counts 2 and 3 is **denied**, and Defendants' motion for summary judgment on Counts 2 and 3 is **granted**.[16]

---

[16]   Defendants also ask this Court to award them attorneys' fees because, say Defendants, Plaintiffs have "assaulted" Defendants' personal character simply by filing this action, and the case is "frivolous." (DE 189 at 19)

First, the filing of a complaint, even if it tends to place the adversary in the wrong, is not a recognized basis for an award of fees. This seems to be some sort of quasi-defamation claim, which would not be likely to arise even if Defendants were to prevail.

Second, I will deny Defendants' request for attorneys' fees based on a frivolous claim. Defendants have neither fulfilled the prerequisites of a Rule 11 motion nor cited Rule 11. They have instead cited N.J. Stat. Ann. § 2A:15-59.1(a)(1). Under that state statute, "[a] party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous." An assertion is deemed frivolous when "'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" *First Atl. Fed. Credit Union v. Perez*, 391 N.J.Super. 419, 432, 918 A.2d 666 (N.J. Super. Ct. App. Div. 2007) (quoting *Fagas v. Scott*, 251 N.J. Super. 169, 190, 597 A.2d 571 (Law Div. 1991)).

In federal court, Rule 11, Fed. R. Civ. P., is the ordinary route for seeking sanctions against a party which has filed a pleading lacking a reasonable basis in law or fact. Under the command of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), this federal court, exercising diversity jurisdiction over a claim arising at state law, is obliged to follow federal procedural rules, even as it applies state substantive law as the rule of decision.

In *McKeown–Brand v. Trump Castle Hotel & Casino*, 132 N.J. 546, 626 A.2d 425 (1993), the New Jersey Supreme Court characterized a statutory award of attorneys' fees as a "procedural matter for the courts." *Id.* at 429–30. That said, my colleague Judge Vazquez has surveyed federal cases in which the district court applied this state fee-shifting statute, although generally in conjunction with Rule 11, and generally in the course of denying an award of fees. *Sun Chem. Corp. v. Fike Corp.*, No. CV134069JMVMF, 2018 WL 3492143, at *3 (D.N.J. July 20, 2018).

Either way, however, this application is defective. Under either § 2A:15-59.1 or Rule 11, the party seeking sanctions cannot just throw a demand into its summary judgment motion. *See* N.J. Ct. R. 1:4–8(b)(1) ("An application for sanctions under this rule shall be by motion made separately from other applications and shall describe the specific conduct alleged to have violated this rule."); Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21

### III.    Conclusion

For the reasons set forth above, Defendants' motion (DE 189) for summary judgment is **GRANTED**. Plaintiff's cross-motion for summary judgment (DE 194) is **DENIED**. An appropriate order accompanies this Opinion.

Dated: May 29, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

---

days after service or within another time the court sets."). *See also Marenbach v. City of Margate,* 942 F. Supp. 2d 488, 498 (D.N.J. 2013) (Party "must file an independent motion or application, separate from any substantive motion that party files"); *Fidanzato v. Somerset, Hunterdon, and Warren Counties Vicinage 13*, No. 11-5132, 2012 WL 4508008, at *9 (D.N.J. Sept. 28, 2012) (explaining that "a party wishing to avail itself of the NJFCA must proceed by way of motion"); *see also* N.J.S.A. 2A:15–59.1(c) ("A party ... seeking an award under this section shall make application to the court which heard the matter. The application shall be supported by an affidavit."); Accordingly, I deny the request for attorneys' fees contained in Defendants' summary judgment motion.